UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE № 21-20513-CR-ALTONAGA

UNITED STATES OF AMERICA,

    *Plaintiff*,

*vs*.

DAISUKE MIYAUCHI,

    *Defendant*.

_____/

## DAISUKE MIYAUCHI SENTENCING MEMORANDUM

**DAISUKE MIYAUCHI** (hereafter **MR. MIYAUCHI**"), through undersigned counsel, respectfully submits this Sentencing Memorandum, pursuant to 18 U.S.C. § 3553(a), and the dictates of *United States v. Booker*, 543 U.S. 220 (2005) and its progeny. In support hereof, **MR. MIYAUCHI** submits the following:[1]

### I. INTRODUCTION

Based upon a total offense level of twenty-four (24) and a criminal history category of I, the Presentence Investigation Report (hereinafter "PSR") recommends a guidelines range of 51 – 63 months. It is from that starting point, level twenty-four (24), that we request this Court take into consideration **MR. MIYAUCHI'S** cooperation and the § 3553 factors set forth herein in fashioning an appropriate sentence for him. This Sentencing Memorandum serves to respectfully show why we believe a substantial downward variance and/or departure from 51 – 63 months to credit for time served (6 months) is warranted in this case.

### II. 5K1.1 DOWNWARD DEPARTURE COOPERATION

On February 7, 2022, the Government filed a U.S.S.G. § 5K1.1 motion seeking a 40% reduction to **MR. MIYAUCHI'S** sentence for his substantial cooperation. We respectfully submit that a 60% reduction more accurately reflects his extremely timely, forthright, and substantial cooperation in this case.

---

[1] Contemporaneous with the filing of this Sentencing Memorandum we are filing approximately 100 letters we received in support of **MR. MIYAUCHI**. Passages from a select number of those letters are incorporated herein.

Rabin & Lopez, P.A., One Southeast Third Avenue, Suite 2600, Miami, FL 33131 • Telephone (305) 358-1064

On August 27, 2021, *the very same day of* his arrest, and without the benefit of a lawyer, **MR. MIYAUCHI** began cooperating *extensively* with the Government regarding his involvement in the instant offense. He divulged his entire role in painstaking detail and readily acknowledged his misconduct. His honesty was remarkable. Thereafter, on September 27, 2021, and October 2, 2021, federal agents and the AUSA assigned to this case interviewed **MR. MIYAUCHI** for several hours. During these debriefings, **MR. MIYAUCHI** provided explanatory information, specifics, dates, names, locations, and evidence that assisted the Government its investigation and prosecution of other cases.

**MR. MIYAUCHI** took responsibility very early on and took affirmative steps to assist the Government. His extensive, substantial, and timely cooperation warrants a 60% reduction.

### III. NATURE AND CIRCUMSTANCES OF THE OFFENSE

**MR. MIYAUCHI** pled guilty to a two-count Information, charging him with violations of 18 U.S.C. § 371 and 16 U.S.C. § 3372(d)(1). The crux of the case against **MR. MIYAUCHI** is his improper use of a permit to export 4,765 Ball Pythons, 277 Blood Pythons, 173 Common Tegus, 102 Argentinian Tegus, 128 Iguanas, and 3 Australian knob-tailed geckos via thirty-nine (39) shipments, and one (1) attempted shipment, ranging from October 17, 2017, through August 27, 2021. Several statutory provisions govern **MR. MIYAUCHI'S** conduct, including the Convention on International Trade in Endangered Species of Wild Fauna and Flora (hereinafter "CITES"), the Endangered Species Act of 1973 (hereinafter "ESA"), and the Lacey Act.

#### A. STATUTORY SCHEME

CITES establishes an international "regulatory system that monitors the trade in wildlife, both flora and fauna, passing through one member country to another." *United States v. Grigsby*, 111 F.3d 806, 814 (11th Cir. 1997) (internal citations omitted). The purpose of CITES is to protect certain species of wild animals and flowers from over-exploitations through international trade. *United States v. One Etched Ivory Tusk of African Elephant*, 871 F.Supp.2d 128, 132 (E.D. NY 2012). The United States incorporated CITES into domestic law through the Endangered Species Act of 1973 ("ESA"). *Grigsby*, 111 F.3d at 815. ESA's purpose was to "provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, to provide a program for the conservation of such endangered species and threatened species, and to take such steps as may be appropriate to achieve the purposes of the treaties and conventions."

6 U.S.C. § 1531. The Lacey Act is an additional enforcement mechanism of CITES and prohibits the submission of false records and labeling of wildlife, both captive bred and found in the wild, that is subject to importation or exportation. 16 U.S.C. § 3372(d)(1) and (2).

CITES created three (3) different levels of regulation that govern the international trade of plants and animals: Appendix I,[2] Appendix II,[3] and Appendix III.[4] 50 C.F.R. § 23.4. Notably, a species belonging to Appendix I will be deemed a species of Appendix II if the species is bred in captivity for commercial purposes. 50 C.F.R. § 23.46. The exception carved out for Appendix I endangered species that are bred in captivity for commercial purposes memorializes the drafter's understanding that the "production in captivity was likely to affect the survival of the species *less* than the removal of animals from the wild." CITES, CAPTIVE-PRODUCED ANIMALS AND ARTIFICIALLY PROPAGATED PLANTS, https://cites.org/eng/prog/captive-breeding (last visited Feb. 11, 2022) (emphasis added).

Consistent with the drafters' understanding that captive-bred animals posed a lower risk of harm to the environment than animals poached from the wild, the U.S. Fish & Wildlife Service created and implemented the CITES Master File permit, that *only* applies to the exportation of captive-bred animals. U.S. FISH AND WILDLIFE SERVICE, FEDERAL FISH AND WILDLIFE PERMIT APPLICATION FORM, https://www.fws.gov/international/pdf/permit-application-form-3-200-85-establishment-of-a-master-file-for-the-export-of-live-animals-bred-in-captivity.pdf. The CITES Master File permit streamlines the exportation process by allowing exporters of captive-bred wildlife to use the single Master File permit in lieu of applying for a permit for each individual export. 50 C.F.R. §§ 13.11 and 23.51. By virtue of the simplified process carved out for the exportation of captive-bred animals alone, the U.S. Fish & Wildlife Service affirmed the belief that CITES' main concern was the exportation of animals taken from the wild.

---

[2]   Species listed in Appendix I are those that are threatened with extinction. 50 C.F.R. § 23.4.

[3]   Species listed in Appendix II are those that may become threatened with extinction unless their trade is subjected to strict regulation. 50 C.F.R. § 23.4.

[4]   Species listed in Appendix III are those which a party believes should be regulated within their jurisdiction and requires the cooperation of other parties to control. 50 C.F.R. § 23.4.

> When the Lacey Act was enacted, the drafters understood that
>
> > From a pragmatic point of view, the protection of an endangered species of wildlife with some commercial value may permit the regeneration of that species to a level where controlled exploitation of that species can be resumed. In such a case businessmen may profit from the trading and marketing of that species for an indefinite number of years, where otherwise it would have been completely eliminated from commercial channels in a very brief span of time.

S. Rep. No. 91–526, reprinted in 1969 U.S.C.C.A.N. 1413, 1415–16. The positive effects of captive breeding were reaffirmed in 2018 when an amendment was proposed to the ESA.[5] In discussing the proposed amendment, the Report for the Committee on Natural Resources identifies that "[l]egal captive breeding of nonnative endangered species is a conservation measure that can create healthy populations of animals to augment recovery of wild populations, decrease illegal wildlife trafficking, and increase educational opportunities relating to the species. H.R. REP. NO. 115-562, at 2 (2018). Consistent with these projections, the rise in demand of captive bred reptiles has essentially obliterated the need to poach reptiles from their native environments to wit., the purpose of CITES. COLLIS & FENILI, *supra* at 11 ("It appears as if the expansion of captive reptile breeding in the United States has helped to crowd out smuggling."). In fact, a 2011 analysis revealed that

> The American pet trade has experienced a significant shift toward domestic captive breeding over the past twenty years. For the past two decades, the number of imports have declined, while, up to 2007, the number of exports increased. However, during this time, the number of reptiles owned by United State households has also steadily increased. *Increasing domestic demand and decreasing foreign supply indicate that the pet trade is less reliant on imported reptiles and more reliant on American breeders and collectors.* The expansion of exports indicates that not only have American breeders been able to meet expanding domestic demand, they are also able to increasingly cater to foreign buyers as well.

*Id.* (emphasis added).

The wildlife at issue, ball pythons, boa constrictors, Sumatra short-tailed pythons, common iguana, Argentine tegus, and common tegus, are all listed under CITES Appendix II and were all

---

[5] The amendment sought to limit the reach of the ESA by excluding nonnative species in the United States from being treated as endangered or threatened species. Ultimately, the amendment was unsuccessful.

captive bred.[6]  Moreover, the three (3) Australian knob-tailed geckos that were not claimed, yet exported in a singular shipment, are not protected under *any* CITES Appendix.[7]  The regulatory system in place facilitates "local authorities, within the various signatory countries to CITES, [in determining] how many animals are being exported, in order to protect the listed species from exploitation." *Grigsby*, 111 F.3d at 814.  While there is no doubt that **MR. MIYAUCHI** used the Master CITES Permit improperly to export his wildlife,[8] he did accurately list the number of species he was exporting, except for the three (3) Australian knob-tailed geckos.  Accordingly, local authorities were not misled in the number of species being exported, and thus were able to accurately account for the number of species to protect the species from exploitation.

This Court possesses the authority to depart from the applicable guidelines when the defendant's "conduct may not cause or threaten the harm or evil sought to be prevented by the law proscribing the offense at issue". U.S. Sent'g Guidelines Manual § 5K2.11 (U.S. Sent'g Comm'n 2004).  Here, this Court should depart from **MR. MIYAUCHI'S** guidelines because his exportation of captive bred wildlife does not cause the evil sought to be prevented by CITES, the Lacey Act, and the ESA.  *See United States v. Rojas*, 47 F.3d 1078, 1080 (11th Cir. 1995) (Referring to a statute's legislative history to determine whether the defendant's conduct was the harm sought to be prevented by the statute.); *United States v. Grigsby*, 111 F.3d 806, 823 (11th Cir. 1997) (Establishing that the sport-hunted trophies exception applied to ivory tusks because the legislative history of the African Elephant Conservation Act reflects that "preservation of elephants for sport hunters actually protects African elephants by placing considerable value on live elephants.").  To

---

[6]     Notably, the common iguana, Argentine tegus, and common tegus are prohibited invasive species in Florida, and have been the subject of several State efforts to eradicate same.  FLA. FISH AND WILDLIFE CONSERVATION COMM'N, PROHIBITED NONNATIVE SPECIES LIST, https://myfwc.com/wildlifehabitats/nonnatives/prohibited-species-list/

[7]     We acknowledge that **MR. MIYAUCHI'S** failure to claim the three (3) Australian knob-tailed geckos in the export documentation was a violation of the Lacey Act.  Nevertheless, it is important to note that these animals are not the subject of any CITES regulation when considering the harm, or lack thereof, caused by **MR. MIYAUCHI'S** conduct.

[8]     **MR. MIYAUCHI** would be able to legally export the animals at issues herein with a CITES permit.  However, he would need to obtain a permit for every shipment.  These permits usually take upwards of six (6) months for approval.  During this time the exporter is responsible to pay for the feeding and care of the reptiles.  Also, if the reptile gets larger the exporter must pay for the additional freight cost.  *See* https://obamawhitehouse.archives.gov/sites/default/files/omb/assets/oira_1018/1018_04182011-3.pdf.

the contrary, it is well accepted that the rise of captive bred species has at the very least, reduced the need to poach these species from their native environments. COLLIS & FENILI, *supra* at 54 ("In summary, over the past decade, rare and thus high-priced reptiles are being delivered to the world from breeders, mostly located in the United States. This trend has, no doubt, reduced considerably the incentives of smuggling rare reptiles into the United States."). Further, the conduct described above, which is attributed to a decrease in the importation of wildlife from their native countries to the United States, is the very conduct that **MR. MIYAUCHI** engaged in. By purchasing exotic, captive bred, CITES animals in the United States, **MR. MIYAUCHI** is contributing to the solution of the problem – the poaching of wildlife from their natural environments.

The defendants in *Bernal* attempted to export an endangered orangutan and gorilla from the United States to Mexico in violation of the Lacey Act and EAS. *United States v. Bernal*, 90 F.3d 465, 466 (11th Cir. 1996). Before sentencing, one of the defendants' guidelines range was 24 – 30 months imprisonment, and the other was 15 – 21 months imprisonment. *Id.* Judge Moreno ultimately sentenced both defendants to 70 days, time served, relying on section 5K2.11 of the Sentencing Guidelines. *Id.* at 467. On appeal, the Eleventh Circuit noted that the purpose of the Lacey Act is to "protect those species of fish and wildlife whose continued existence is presently threatened, by gradually drying up the international market for endangered species, thus reducing the poaching of any such species in the country where it is found" and the purpose of the Endangered Species Act is to "enforce international agreements designed to conserve to the extent practicable the various specific of fish or wildlife and plants facing extinction." *Id.* (Internal citations and quotations omitted). Applying the defendants' conduct to the purpose of the statute, the Court affirmed both sentences, reasoning that there was no evidence in the record that the defendant intended to harm the endangered animals he was attempting to export. *Id.* Instead, the facts established that the defendant loved animals and intended to use the animals for "breeding purposes to help perpetuate the species." *Id.*

Like the defendant in *Bernal*, **MR. MIYAUCHI** possessed no intention to harm the wildlife he was exporting. To the contrary, by exporting the wildlife from the United States, **MR. MIYAUCHI** contributed to the reduction in demand for wildlife exported from its origin country. Further, by exporting the wildlife to Japan, **MR. MIYAUCHI** contributed towards the repopulation of the wildlife, reducing its chances of extinction.

## B. VALUE OF WILDLIFE

Captive-bred reptiles are significantly more expensive than reptiles captured from the wild. TEXAS A&M UNIV., VETERINARY & BIOMEDICAL SCIENCES, CAPTIVE BRED VS WILD CAUGHT (Jan. 19, 2010) https://vetmed.tamu.edu/news/pet-talk/captive-bred-vs-wild-caught/  This is due in large part to the genetic modifications and mutations that are created through captive breeding and absent in species taken directly from the wild. "The emergence of novel colour and pattern strains known as 'morphs' has also been a significant driver of growth in demand for captive bred Ball pythons by creating competition among breeders and owners for the most unusual and exotic characteristics."  Jennah Green et al*., Blind Trading: A Literature Review of Research Addressing the Welfare of Ball Pythons in the Exotic Pet Trade*, Animals, Jan. 22, 2020, at 2.  "In general, the price of a morph is positively related to the distinctiveness of the reptile's color and the rarity of the morph." COLLIS & FENILI, *supra* at 17.

Without minimizing the seriousness of **MR. MIYAUCHI'S** conduct, it is important to highlight the manner in which the advisory Guidelines overstate and over-penalize **MR. MIYAUCHI'S** conduct. The driving force behind **MR. MIYAUCHI'S** guidelines is the retail market value of the wildlife at issue.  Pursuant to his plea agreement, the fair market value of the wildlife is greater than $1,500,000, but less than $3,500,000.  However, this number reflects the inflated price of captive-bred species due to their profitable mutations. Had **MR. MIYAUCHI** purchased the reptiles from a seller who removed the reptiles from their native habitat instead, the evil which the statutes are aimed to prevent, his guidelines would be far lower.  In other words, **MR. MIYAUCHI** is facing a greater penalty for exporting captive-bred reptiles and selling them at their increased market value price, than he would have had he exported the animals from the wild at their far lower price.[9]  This result is wholly inconsistent with the purpose of the statute.

---

[9]     *See United States v. Hunt*, 459 F.3d 1180, 1184–85 (11th Cir. 2006) ("There are, however, many instances where the Guidelines range will not yield a reasonable sentence.") citing *United States v. Jimenez-Beltre*, 440 F.3d 514, 518 (1st Cir. 2006) (("Yet the guidelines are still *generalizations* that can point to outcomes that may appear unreasonable to sentencing judges in particular cases. Some of the guidelines in particular cases were not reflections of existing practice but were deliberate deviations or turned tendencies into absolutes. Others have been affected by directions from Congress. *Booker*'s remedial solution makes it possible for courts to impose non-guideline sentences that override the guidelines, subject only to the ultimate requirement of reasonableness." (citation omitted)); *see also United States v. Adelson*, 441 F. Supp. 2d 506, 506 (S.D.N.Y. 2006), *aff'd,* 301 Fed. Appx. 93 (2d Cir. 2008) (This is one of those

Further, the loss number also reflects the average retail price on **MR. MIYAUCHI'S** company website, Maniac Reptiles. However, as reflected by **MR. MIYAUCHI'S** tax return, the majority of his business was wholesale not retail. Additionally, the value of the wildlife accounts for all of **MR. MIYAUCHI'S** exports of CITES protected animals from October 17, 2014, though August 27, 2021. However, those numbers account for the CITES wildlife that *wasn't* properly exported *and* the CITES wildlife that *was* properly exported.

In sum, we ask this Court to find that **MR. MIYAUCHI'S** conduct, primarily the improper use of a permit to export captive bred CITES Appendix II wildlife, is not the type of harm that CITES, the ESA, and the Lacey Act attempted to remedy, justifying a downward variance for time served. Instead, the current state of the international reptile trade, and domestic American reptile breeding industry, indicates that **MR. MIYAUCHI'S** conduct is part of the solution, and not the problem. **MR. MIYAUCHI'S** conduct and his guidelines, driven by the inflated price of rare captive bred wildlife, serve to penalize him, rather than reward him for his decision not to poach wildlife from their native environments. *See Gall v. United States*, 552 U.S. 38, 54 (2007) ("Moreover, the unique facts of Gall's situation provide support for the District Judge's conclusion that, in Gall's case, 'a sentence of imprisonment may work to promote not respect, but derision, of the law if the law is viewed as merely a means to dispense harsh punishment without taking into account the real conduct and circumstances involved in sentencing.'").

### IV. UNWANTED SENTENCING DISPARITIES

18 U.S.C. § 3553(a)(6) requires that the sentencing court consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." This factor "concerns *national* disparities between defendants with similar criminal histories convicted of similar conduct. . . ." *United States v. Conatser,* 514 F.3d 508, 521 (6th Cir.2008).

The United States Sentencing Commission's "Interactive Data Analyzer" (hereinafter referred to as "IDA") is an online tool, which allows users to filter and customize the most up-to-

---

cases in which calculations under the Sentencing Guidelines lead to a result so patently unreasonable as to require the Court to place greater emphasis on other sentencing factors to derive a sentence that comports with federal law.); *United States v. Corry*, 206 F.3d 748, 751 (7th Cir. 2000) ("That the loss overstates the seriousness of the offense is, to use *Koon*'s terminology, an encouraged basis for departure. It was on that sound basis that Judge Barker granted a 2–level departure.").

date federal sentencing data based on a variety of factors including, fiscal year (2015-2020); geography (circuit, state, and district); defendant demographics (race, gender, age, citizenship, education); crime type; primary guideline (applicable guideline section of the Federal Sentencing Guidelines); sentencing zone; and criminal history.  After inputting the factors most relevant to **MR. MIYAUCHI'S** case, to wit: Fiscal Year: 2018-2020; Geography: National; Demographics: Non-U.S. Citizen; Crime Type: Environmental; Primary Guidelines: § 2Q2.1; Sentencing Zone: D; Criminal History: I, the IDA produced the following sentencing outcomes:

- Distribution of Sentence Length and Imprisonment Length: 100% of the defendants were sentenced to a term of imprisonment of 24 months or less.
- Average Sentence Length and Imprisonment Length: *4 months.*
- Median Sentence Length and Imprisonment Length: *6 months.*

A copy of the sentencing outcome distribution charts produced by the IDA after inputting the aforementioned sentencing factors are attached hereto and incorporated by reference herein as Exhibit № 1.  **MR. MIYAUCHI** has already served the average prison sentence imposed to defendants with similar sentencing factors.  Accordingly, a sentence of time served is most appropriate to ensure that **MR. MIYAUCHI**'s sentence is consistent with other similarly situated defendants.

### V. EXTRAORDINARY ACCEPTANCE OF RESPONSIBILITY

"Acceptance of responsibility" results in a three-level departure from the Advisory Sentencing Guidelines pursuant to U.S.S.G § 3E1.1.  If a defendant does not cooperate, and merely pleads guilty, he or she will be entitled a three-level departure.  In this case, **MR. MIYAUCHI** did not just plead guilty.  **MR. MIYAUCHI** accepted responsibility and began cooperating with the Government on the very same day of his arrest.

This Court is not precluded from varying downward from the Advisory Guideline Sentence based on extraordinary acceptance of responsibility by the Defendant.  In *United States v. Sol*, the Eleventh Circuit took into account a defendant's "extraordinary acceptance of responsibility" as part of the 3553-factor analysis. *Id*. at 522 Fed. Appx.567, 568 (11th Cir. 2013). The court found that the defendant's guilty plea along with her cooperation during her prosecution should be factored into the sentence. Similarly, this Court, should consider **MR. MIYAUCHI'S** cooperation when determining a sentence that is sufficient but not greater than necessary.

**MR. MIYAUCHI** took responsibility very early on and took affirmative steps to assist the Government in its investigation. His actions since the inception of this case exhibit a man who is truly remorseful for his criminal behavior and as such warrant a variance below the applicable guideline range.

### VI. HISTORY AND CHARACTERISTICS OF MR. MIYAUCHI

> But, surely, if ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance. This elementary principle of weighing the good with the bad, which is basic to all the great religions, moral philosophies, and systems of justice, was plainly part of what Congress had in mind when it directed courts to consider, as a necessary sentencing factor, 'the history and characteristics of the defendant.'

*United States v. Adelson*, 441 F. Supp. 2d 506, 514 (S.D.N.Y. 2006), *aff'd*, 301 Fed. App'x. 93 (2d Cir. 2008).

#### A. REFLECTIONS OF MR. MIYAUCHI'S EARLY LIFE AND REPTILE BUSINESS

Fundamentally, **MR. MIYAUCHI** is an incredibly compassionate and empathetic human being who has a deep respect and great admiration for all living beings. He is a loving husband to Sari Miyauchi and an attentive father to his two (2) sons Taiga Miyauchi and Neo Miyauchi. **MR. MIYAUCHI** is also a well-respected, self-made businessman and a community leader in his hometown of Yokohama, Japan.

**MR. MIYAUCHI** was born on February 10, 1980, in Shizouka, Japan. He is the second child of Masafumi Miyauchi and Yausko Miyauchi, who have been married for over forty-six (46) years. **MR. MIYAUCHI** grew up in a middle-class family. His father was a civil engineer and his mother, a homemaker. **MR. MIYAUCHI** and his older sister were raised by their parents to be hard-working and respectful individuals. **MR. MIYAUCHI** has lived in Japan for the greater part of his life. He has no family in the United States. As a child, **MR. MIYAUCHI** was very active in sports and excelled in basketball. After completing middle school, **MR. MIYAUCHI** was sent to boarding school in New Zealand. Although being away from his family in a foreign country was very challenging for **MR. MIYAUCHI**, he persevered and made very lasting friendships.

Upon graduation from high school, **MR. MIYAUCHI** returned to Japan for college and obtained a Bachelor of Arts in International Trade, within the Economic Department. In 2003, **MR. MIYAUCHI** started his current company, Maniac Reptiles, a reptile store in Yokohama. **MR.**

**MIYAUCHI** took a risk and decided to combine his degree in International Arts with his love and passion for reptiles. He put countless hours into researching and growing his business. **MR. MIYAUCHI** is now a well-respected and successful businessman and serves as a community leader in his hometown. Despite his success, **MR. MIYAUCHI** never lost his compassion, admiration, and respect for all living beings. He continues to live his life guided by these values. Several of **MR. MIYAUCHI'S** friends, employees, and colleagues in the reptile industry have written letters in his support. Their descriptions of **MR. MIYAUCHI** shed light on his character as a businessman and pillar of his community.[10]

> He is always willing to share and teach from his wide range of knowledge and skills, there are a great deal of customers, both those starting out in the hobby and those who have been a part of it for years that depend upon him for his expertise. He has a very devoted following in the Japanese reptile community, and I count myself as one of them. From his family to his friends, and those in the industry such as myself, there are a great deal of people who need him.

- **Shunsuke Miyazaki, Maniac Reptile Manager**

> Mr. Miyauchi has shown me on several occasions to be of special character that has been lost by so many today. I would like to outline a few of them:
>
> In this very first meeting with me Mr. Miyauchi was surprised that I gave him a discount for a multiple animal purchase as it was customary at the time to charge international customers higher pricing than domestic customers. He has on several occasions informed me when my pricing was too low for the international market. This only aids me, and showed me he cared about myself and my farm over his bottom line from the start even before we became friends.
>
> Mr. Miyauchi wrote a book covering some of the current captive bred color and pattern mutations happening in the ball python industry. In this book he gave credit to all of us for producing the animals pictured thus giving away his sources for these special projects. Again, this helped us (animal producers) over himself, by connecting with each other.

---

[10] *See United States v. Prosperi*, 686 F.3d 32, 40 (1st Cir. 2012) ("It also observed that if any of the letter writers came to Prosperi and Stevenson seeking advice in a similar situation, the two defendants 'would have been the first to say, 'This is morally wrong, you shouldn't do this, this should not be the choice that you should make.' Why they made that wrong choice for themselves, as I say, is the piece of the puzzle that I find hardest to answer.'").

> [I] am constantly impressed and surprised by his generosity, genuine interest and care in myself and my business. Today's world is very selfish or at least self-centric, and Mr. Miyauchi is the opposite. Mr. Miyauchi is about growth, connections, and the betterment of those around him by creating opportunity.

- **Benjamin W. Cole, Friend and Colleague Reptile Industry**

> One of the first times Daisuke and I talked, he took over a half hour to show me the best ways to pack animals for transport so they are as safe and secure as possible. I have always known that if I needed help with anything related to the care of reptiles, I could depend on Daisuke to help me with the answer, either from his own experience, or by directing me to the right source.

- **Nick Esposito, Friend and Colleague Reptile Industry**

> I am an author and director of a 501c3 NGO dedicated to the conservation of turtles. I write books about the care and conservation of reptile and amphibians. This work takes me to reptile shows, conferences, and expos around the country.
>
> At the end of expos, I have personally witnessed Mr. Miyauchi carefully packing up animals, meticulously going through each one, from tiny geckos to larger snakes and lizards, and making sure each one is properly contained and comfortable for the long journey back to Japan. I have seen him purchase and use state-of-the-art heat packs, cool packs, and specially made styrofoam-lined shipping boxes, again to make sure these animals receive the safest and most comfortable journey.

- **Russ Gurley, Friend and Colleague Reptile Industry**

### B. Reflections on Mr. Miyauchi's Love for Animals

Although **Mr. Miyauchi's** business focuses on reptiles, his love for animals extends to every living creature. His love for all living creatures is also reflected in the sentencing letters written on his behalf.

> Miyauchi has always loved animals and kept puppies, which had been abandoned on the roadside. At that case, he was not able to keep them at home, however he never gave up to look for someone who was willing to pick them up. I cannot forget his bright smile that he was as happy as a teenage boy when he found a taker, the boy.
>
> Generally we face the death of animals on animal shops and he occasionally goes to memorial service at Japanese shrines for the sake of their early death. It shows how he loves animals with great respect and value living things in mind.

- **Hiroshi Sanada, Family Friend**

    My family home has a pond where we keep large koi, but we were struggling with raccoons catching our koi and eating them, so I decided to ask for his advice. He carefully explained his solution, which wasn't to exterminate or kill the raccoons, but to chase them off the property. . . . He preached the importance of co-existence instead of extermination, and I recall being extremely impressed with his respect for all life.

    His actions are motivated by a love of animals, and his personality is one of extreme kindness and compassion. He has taught me that any animal can co-exist with people, and I feel he has taught me the proper relationship between humans and nature.

- **Hidehiko Sakai, Family Friend**

    I'm told that Japan has fewer households that keep pets. In particular, he told me that the number was low for reptiles, amounting to only 2.6% of households in Japan.  In that environment, he told me that there were many people who abandon snakes and other reptiles that were recommended to them by a pet shop because they grow tired of them or bored of keeping them. Mr. Miyauchi put a great deal of effort into sheltering these abandoned animals and trying to find them new homes.

- **Toshika Sakai, Family Friend**

### C. REFLECTIONS FROM AND ABOUT MR. MIYAUCHI'S FAMILY

Above else, **MR. MIYAUCHI** values and cherishes his family.  In 2016, **MR. MIYAUCHI** married the love of his life, Sari Miyauchi.  **MR. MIYAUCHI** is a loving and supportive husband to Sari.  He is also an extremely dedicated father to his two (2) children, Taiga Miyauchi, age ten (10), and Neo Miyauchi, age four (4).  His love and dedication for his family is reflected in the many letters submitted on his behalf.

    I am attracted to him because he expresses his feelings straightly honest, and he has an upright heart to discuss the things until we are both satisfied. Shortly after dating, we started living together. He is responsible and takes care of my life, even before we got married. He gives loads of love to me, our son and all animals.

    Our son becomes scared at night being in a house without his dad.  He asks for the lights even in the rooms we do not use because he is afraid of a quiet house.

- **Sari Miyauchi, Wife**

Because Daisuke was so busy with work, he was unable to help as much with childrearing as he wished and concerned that it was too much work for my daughter, so he asked me to consider moving in with them. Given how stressful it can be to live with a mother-in-law, it surprised me when he was the one who approached me with invitation, and really drove him his dedication and thoughtfulness to his family.

Moreover, in order for me to earn an income, he invested the necessary funds so that I could start a small restaurant that I had always wanted to open and run. He told me not to worry about returning the money and to focus on doing what I can to support my daughter.

- **Shizue Hayashi, Mother-in-Law**

When I started my company, I needed a co-signer, and when I asked him, he happily accepted the responsibility. He treats all of us in his extended family extremely well. Daisuke is the only man in the family that we can depend on because neither myself nor our other younger sister is married. During long holidays, he will take me, my two sisters, our mother, and our nephew for vacations overseas or faraway destinations here in Japan.

Currently, my younger sister who is married to Daisuke is struggling a great deal in his absence, and while we are doing our best to support her, her anxiety, stress, and fatigue are immeasurably high at the moment.

- **Ami Nakagawa, Sister-in-Law**

Daisuke is a gentle and thoughtful son-in-law who makes certain to bring my daughter and grandson along with him to visit me all the way in Osaka every New Year. Each time he visits, he brings his pet dog and meerkat along in his car, and he constantly reminds me of the preciousness of animals.  He has made sure that my daughter Sari is well taken care of, and as a father, he has been a great relief to my mind. He is respectful in interacting with me as his father-in-law but is not afraid to share his opinion to me. Although my daughter is currently struggling, because I live so far away, I am unable to help her directly, which has been frustrating.  My daughter is a stay-at-home mother, and she has not had to work since marrying Daisuke. I am concerned if she will be able to make ends meet until her husband returns.

- **Masahiro Nakagawa, Father-in-Law**

#### D. REFLECTIONS BY MR. MIYAUCHI'S FRIENDS

"You can easily judge the character of a man by how he treats those who can do nothing for him."[11] **MR. MIYAUCHI'S** numerous acts of kindness extend not only to his family, but also to his close friends and acquaintances. One clear theme that emerges from the numerous letters of support filed on behalf of **MR. MIYAUCHI** is that he is, and has always been, a loyal, kind and compassionate human being who is keenly aware of the community around him and the needs of others.

> He is a man who uses a brush of "good" upon a canvas of "honesty" when drawing the piece of art that is his life. There must be some reason for his recent actions. He has an extremely compassionate attitude not only toward people but toward all animal life in general. He is someone who can't abandon animals who are injured or are in unfortunate circumstances.

- **Kanae Kawashima, Family Friend**

> On one rainy day when our families were going out to lunch, as we walked to the restaurant, he always made certain to stand on the road side of the sidewalk, in order to protect his wife and son. I'm told he does this every time they go out for a walk. When a frog suddenly jumped out onto the road, he gently picked it up in his hand and placed it into a nearby flower planter. My impression of him from those actions was that he was an extremely gentle and thoughtful man.
>
> At the restaurant, he would give little bits of his own lunch to his wife and son, and it was really heartwarming to see how much he loved his family. On the way home from the restaurant, we came across an elevated crossing with stairs. When he saw that an old woman was trying to cross the elevated crossing carrying bags, he immediately called over to her, telling her that he would carry her bags for her over the crossing, and handed me his umbrella to go help. He went to help the old woman cross without any regard to the fact that he was getting rained on. I could only stare in surprise at his action, and I vividly recall how eagerly he went to help.
>
> He is someone who can't leave anyone in trouble without helping them, whether or a frog on the street, or a old woman crossing a street in the rain.
>
> He is someone whose compassion and kindness shows in everything he does. He is a wonderful human being who pours his love into everything.
>
> I would like to take a walk with him again.

- **Miki Kawashima, Family Friend**

---

[11] Malcom S. Forbes

> I have lived here In Japan since I was 19. I am 65 now. I have known and worked with Daisuke for over 20 years. I also work in the pet industry here in Japan.
>
> Being a foreigner over here with a business has many challenges. Banks don't really want to work with us. Daisuke gave me an Interest free loan and allowed me to pay him back at my own pace. It took me five years. He never complained. No one else offered to help us. Who does that? I think he has learned a valuable lesson. Spending time locked up in a foreign Jail has already changed him and scared him to death.

- **Michael Coleman, Friend and Colleague**

**MR. MIYAUCHI'S** ever-present willingness to go above and beyond the call of duty to help others is apparent from the hundreds of letters submitted on his behalf. If there were more people in this world with the same characteristics as **MR. MIYAUCHI**, it would undoubtably be a better place for *all*, reptiles included.

## VII. IMMIGRATION/DEPORTATION

As a non-citizen, **MR. MIYAUCHI** will be deported to Japan upon completion of his sentence. While this Court is limited from departing downwards based on **MR. MIYAUCHI'S** immigration consequences alone, this Court can nevertheless consider the extraordinary impact that a guideline range sentence would have on **MR. MIYAUCHI** as a non-citizen when justifying a variance.

> The Supreme Court previously acknowledged the severe penalty of deportation, stating:
>
> We have long recognized that deportation is a particularly severe "penalty," but it is not, in a strict sense, a criminal sanction. Although removal proceedings are civil in nature, deportation is nevertheless intimately related to the criminal process. Our law has enmeshed criminal convictions and the penalty of deportation for nearly a century. And, importantly, recent changes in our immigration law have made removal nearly an automatic result for a broad class of noncitizen offenders. *Thus, we find it "most difficult" to divorce the penalty from the conviction in the deportation context. Moreover, we are quite confident that noncitizen defendants facing a risk of deportation for a particular offense find it even more difficult.*

*Padilla v. Kentucky*, 559 U.S. 356, 365 (2010) (internal citations omitted) (emphasis added). In 2014, the Eastern District Court of New York addressed at length the impact of deportation on sentencing. *United States v. Chin Chong*, No. 13-CR-570, 2014 WL 4773978, *1 (E.D. N.Y. Sept. 24, 2014). The court stressed that the

> Application of routine sentencing principles should lead district courts to account for the prospect of deportation when considering imposition of a term of incarceration. For district judges who face real persons—judges who are duty-bound to act 'in a field of pain and death,' sensitivity to the reactions of the individuals subject to our criminal justice system ensures that sentences are 'sufficient, but not greater than necessary.

*Id.* at *1. (Internal citations omitted). In *United States v. Bakeas*, the district court varied from the defendant's guidelines of twelve (12) months imprisonment, down to three (3) years' probation because the defendant would face "far more onerous conditions" while housed in a medium security facility, than he would in a minimum-security facility that is unavailable to non-citizens. *United States v. Bakeas*, 987 F.Supp. 44 (D.C. Mass. 1997). The Court determined that housing the defendant in a medium security facility, based solely on his inability to qualify for a minimum-security facility as a non-citizen, would run afoul of the 18 U.S.C. § 3553's command that a sentence must be "sufficient, but not greater than necessary." *Id.* at 49.

**MR. MIYAUCHI** has served approximately six (6) months in jail under trying circumstances given his inability to communicate in English and the fact that no family and friends have been able to visit. The First Circuit Court of Appeals noted that

> I think it is very difficult at times, for those of us who are judges or prosecutors or lawyers, to put ourselves in the shoes of a person with no prior experience with the criminal justice system who finds himself or herself accused of a crime. I do not think, sometimes, we fully recognize the anguish and the penalty and the burden that persons face when called to account, as these men are, for the wrong that they committed.

*United States v. Prosperi*, 686 F.3d 32, 48 (1st Cir. 2012). This is especially true for **MR. MIYAUCHI** who is facing, for the first time in his life, a foreign criminal justice system. Moreover, the conditions of **MR. MIYAUCHI'S** imprisonment are exacerbated by his family's inability to come visit him.[12] Further, because Japan is fourteen (14) hours ahead of Miami, **MR. MIYAUCHI** also

---

[12] *See* THE EFFECTS OF PRISON VISITATION ON OFFENDER RECIDIVISM, MINNESOTA DEPARTMENT OF CORRECTIONS 1 (November 2011) https://nicic.gov/effects-prison-visitation-offender-recidivism ("While offenders are in prison, visits from family and friends offer a means of establishing, maintaining, or enhancing social support networks. Strengthening social bonds for incarcerated offenders may be important not only because it can help prevent them from assuming a criminal identify but also because many released prisoners rely on family and friends for employment opportunities, financial assistance, and housing.) (Internal citations omitted).

faces the additional challenge of successfully scheduling his calls at a time that: (1) his family will be awake; and (2) the Bureau of Prison permits.

Moreover, we ask the Court to consider the additional immigration related consequences that **MR. MIYAUCHI** will face for his offense. For over eighteen (18) years **MR. MIYAUCHI** has provided for his family through his business, Maniac Reptiles. The success of his business depended in large part on his ability to visit the United States to attend reptile shows and purchase reptiles. While **MR. MIYAUCHI'S** business dealings are the cause of his conviction, there is no question that **MR. MIYAUCHI'S** business also engaged in entirely legal, non-CITES business. Once deported back to Japan, **MR. MIYAUCHI** will not be allowed to re-enter the United States for *any* purpose. Being deprived of the American market will impose an additional burden that will outlive any sentence imposed – that burden will be borne not only by **MR. MIYAUCHI,** but his family and seven (7) employees.

A sentence that imposes additional prison time, other than time served, will have the effect of keeping **MR. MIYAUCHI** in prison, under the same trying circumstances, up until the date he is deported to Japan. Moreover, his incarceration will be followed by an additional period of custody in an immigration detention facility while he navigates removal proceedings. This punishment is certainly greater than necessary to achieve the goals of 18 U.S.C. § 3553.

### VIII. LOW RISK OF RECIDIVISM

Recently, the United States Sentencing Commission published a report setting forth statistical analysis on recidivism for offenders released in 2010.[13] The study showed that people are less likely to recidivate when they fall into the following categories: college graduates; non-violent offenders; first-time offenders; and offenders who have had no prior contact with the criminal justice system.[14] The study also showed that recidivism rates decline relatively consistently as age increases.[15]

---

[13] *See* Recidivism of Federal Offenders Released in 2010, https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2021/20210930_Recidivism.pdf (Sept. 2021).

[14] *Id.* at 25-29, 31-32.

[15] *Id.* at 29-30.

**MR. MIYAUCHI** is a non-violent first-time offender who has had absolutely no contact with the criminal justice system.  He completed college and received his bachelor's degree.  **MR. MIYAUCHI'S** low risk of recidivism is further strengthened by his incredibly strong support system at home.

> I was very impressed with his tensed and quivering voice with fear and anxiety when we first spoke on the phone after his arrest. He should have already known the significance of the crime that he has committed. I am sure he would not make the same mistakes again nor will I let him.

- **Sari Miyauchi, Wife**

> While I understand the thought process behind wishing to have Mr. Miyauchi atone for his crimes and serve out his sentence in the United States before returning to Japan, he is a Japanese citizen with his roots in Japan rather than in the United States. If he is to find redemption for his crimes and return to being a productive member of society, there is a much greater possibility that he accomplishes that difficult task not in the United States but in Japan where he was born and raised and has countless beloved family and friends. While he has little in the way of a support network in the United States, he has a strong web of friends and family who can keep him from committing the same mistakes in his native land.  They are all eager for him to return but are also truly dedicated to making certain he does not make the same mistakes a second time. Further, Mr. Miyauchi has a young child, and for his family's sake, I believe it would be best if he were to work toward making up for his crimes and rehabilitating himself to society in Japan.
>
> [I] have faith that the United States is a merciful country that does not judge a man simply by his mistakes, but one that understands that a man ought to be given a chance to reform and return to being a contributing member of society.

- **Kazuhisa Yamada, friend**

**MR. MIYAUCHI'S** sincere remorse for his actions, coupled with his incredibly strong support system at home, reinforces the fact that he poses little to no risk of recidivism.

### IX. CONCLUSION

We recognize that Sentencing is the most sensitive and difficult task that any judge is called upon to take.[16]  As this pleading supports, **MR. MIYAUCHI** is extremely remorseful for his actions.

---

[16] *United States v. Adelson*, 441 F. Supp. 2d 506, 515 (S.D.N.Y. 2006), *aff'd,* 301 Fed. Appx. 93 (2d Cir. 2008) ("To put this matter in broad perspective, it is obvious that sentencing is the most sensitive, and difficult, task that any judge is called upon to undertake. Where the Sentencing Guidelines provide

He is an incredible human being who has spent his entire life helping others and who went into the reptile business because of his true passion for animals. We suggest the guideline sentence in this case significantly overstates the severity of the crime. **Mr. Miyauchi's** acceptance of responsibility, and credible and reliable cooperation with law enforcement, shows that he has come to grips with what he has done and is set on making a break between the past and the future. He has served approximately six (6) months in jail in a foreign land away from his family and will be deported and suffer the collateral consequences of a felony conviction. We respectfully submit that these factors provide support for a sentence of six (6) months (credit for time served).

Respectfully submitted,

**Rabin & Lopez, P.A.**
SunTrust International Center
One Southeast Third Avenue
Suite 2600
Miami, FL 33131
Tel: 305•358•1064
Email: sjr@miamilawyer.com

s/ *Samuel J. Rabin, Jr.*

Samuel J. Rabin, Jr.
Florida Bar № 273831

s/ *Andrea C. Lopez*

Andrea C. Lopez
Florida Bar № 109512

## Certificate of Service

I Hereby Certify that on this 15th day of February 2022, a true and correct copy of the foregoing was furnished via the CM/ECF system to all parties designated to receive the electronic filings in this cause.

s/ *Samuel J. Rabin, Jr.*

Samuel J. Rabin, Jr.

---

reasonable guidance, they are of considerable help to any judge in fashioning a sentence that is fair, just, and reasonable. But where, as here, the calculations under the guidelines have so run amok that they are patently absurd on their face, a Court is forced to place greater reliance on the more general considerations set forth in section 3553(a), as carefully applied to the particular circumstances of the case and of the human being who will bear the consequences.").